GEORGE DARSAKLIS ET AL., APPELLANTS AND CROSS-APPELLEES, V. GEORGE SCHILDT ET AL., WILLIAM K. LAMBERT, INTERVENOR, APPELLEES AND CROSS-APPELLANTS.

358 N.W.2d 186

Filed November 9, 1984. No. 83-297.

Steven C. Smith of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellants.

Clark G. Nichols of Winner, Nichols, Douglas and Kelly, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

GRANT, J.

Plaintiffs-appellants, George Darsaklis and Angie Darsaklis, husband and wife (hereinafter Darsaklis), are the owners of the west half of Section 11, Township 20 North, Range 50 West, of the 6th. P.M., Morrill County, Nebraska. Defendants George Schildt and Robert Schildt (hereinafter collectively Schildts) are son and father, and farm various lands as a partnership. During the crop year of 1982, Schildts leased the east half of the section described above and farmed that land as tenants. Intervenor, William K. Lambert (hereinafter Lambert), the successor in interest to Maude Lambert, was the owner of the east half of the section and leased that land to Schildts.

In the petition, Darsaklis sought an injunction enjoining Schildts from discharging waste irrigation water upon the Darsaklis land. In their answer Schildts admitted that waste irrigation water from their leased land flowed into a drain on the Darsaklis land, but denied that such water damaged Darsaklis; and further alleged that in 1969 William Glau (the predecessor in title to the Darsaklis land) and Maude Lambert (the predecessor in title to the Lambert land) entered into a partly oral and partly written agreement for the construction of a concrete and sod waterway across the Darsaklis land, that this agreement gave Maude Lambert the right to discharge waste irrigation water in a reasonable amount into this waterway, and that this right constituted a permanent easement. For further answer Schildts alleged that, in any event, for more than 10 years the owners and users of the Schildt-farmed land had discharged waste irrigation water "openly, notoriously, continuously, and adversely" across the Darsaklis land and therefore had a prescriptive right to do so. For reply to this answer Darsaklis admitted there was a conditional agreement between the previous owners of each party's land and that the users of the Lambert land were only allowed to discharge reasonable amounts of waste irrigation water onto the Darsaklis land. Lambert's petition in intervention adopted the same position as his tenants, the Schildts. In his cross-petition Lambert sought to quiet title to an easement over the Darsaklis land approximately 6 feet in width "for the purpose of

discharging a feasible amount of irrigation waste water," and to enjoin Darsaklis from interfering with the discharge of irrigation waste water over the Darsaklis land.

After trial the trial court dismissed the Darsaklis petition; denied Lambert's cross-petition insofar as it sought to quiet title in an easement over the Darsaklis land; and granted Lambert's cross-petition in the following respects:

Intervenor and his sucessors in title shall have the right to discharge reasonable amounts of irrigation waste water through two existing culverts onto Plaintiffs' land . . . and Plaintiffs are enjoined from interfering with the discharge of those waters upon their land. Intervenor shall maintain the culverts, but shall have no responsibility for the maintenance of the drainways on the Plaintiffs' land. The amount of discharge of irrigation waste water which is reasonable is to be determined by the capacity of the concrete drains existing on Plaintiffs' land and the amount of irrigation waste water discharged from Intervenor's land in the exercise of good irrigation farming practices.

Darsaklis timely appealed and contends the trial court erred in (1) refusing to enjoin the Schildts and Lambert from discharging waste irrigation water onto the Darsaklis land; (2) determining there was still an agreement by the predecessor in title to Darsaklis, binding and enforceable against Darsaklis, allowing Schildts and Lambert to discharge reasonable amounts of irrigation waste water onto the Darsaklis land; (3) determining what was a reasonable amount of irrigation waste water, under the agreement and facts of the case; and (4) ruling that Darsaklis had notice of the terms of the agreement, whether actual or constructive, upon the purchase of the property.

On their cross-appeal Schildts and Lambert contend the court erred in not finding that Lambert had a prescriptive right to an easement. For the reasons set out below we determine that Lambert does not have an easement, and therefore we reverse in part and in part affirm.

This matter, being equitable in nature, is reviewed by this court de novo, subject to the rules that (1) where credible

evidence on material issues is in conflict, this court will consider that the trial court observed the witnesses and accepted one version of the facts over another, and (2) where the trial court has viewed the premises, this court is required to consider any competent and relevant facts revealed by the view and any findings made by the court, provided that the record contains competent evidence to support the findings. Neb. Rev. Stat. § 25-1925 (Reissue 1979); *Masid v. First State Bank*, 213 Neb. 431, 329 N.W.2d 560 (1983); *Mader v. Mettenbrink*, 159 Neb. 118, 65 N.W.2d 334 (1954). We note that the trial judge viewed the premises and that the record does not contain any findings which are specifically based on that view.

This action involves the drainage of irrigation waste water from the east half of Section 11, Township 20 North, Range 50 West, of the 6th P.M., Morrill County, Nebraska, onto land in the west half of that section. The east half is owned by Lambert, a California resident, and rented by the Schildts. The west half is owned and farmed by Darsaklis. This section drains naturally from east to west across the Darsaklis farm. The Northport Irrigation Canal, supplying water to the area's farmers for irrigation, runs along the east edge of the Lambert lands. Lambert's tenants use the water from the canal and run it through their fields under a gravity irrigation system, producing considerable waste water at the west end of the farm. It is this irrigation waste water, an unavoidable part of gravity irrigation, which is the subject of this dispute.

William Glau was the predecessor in title to Darsaklis. Glau owned the west half of Section 11 from 1954 until 1973. During this time, John Seng was Glau's tenant. Beginning in 1954, Glau and Seng complained to Maude Lambert's then tenant, Lloyd Nichols, who farmed the Lambert land from 1953 to 1963, about the waste irrigation water being run through the Glau place. Because of this problem, Glau and Maude Lambert both contributed money, first in 1965 and later in 1969, to attempt to correct the situation. In 1969 the two entered into a government cost-sharing program to line portions of two drains on the Glau land with concrete. These two drains diverted both waste water and storm water. Both drains run west from a field road dividing the Darsaklis and Lambert farms.

After the cement drains were installed the relationship between Seng (Glau's tenant) and George Karubas (Lambert's tenant after Nichols) improved. The water problem was so improved that Seng farmed rows running north and south across the north drain. In 1974 Glau sold his land to Darsaklis.

George Karubas farmed the Lambert lands from 1968 through 1981. While Karubas farmed the Lambert farm, he was responsive to, first, the concern of Seng and then to that of Darsaklis about waste water. Karubas varied the size of his irrigation tubes and rows, installed trash catchers, and regularly monitored the water to reduce his waste. Although Karubas attempted to control his irrigation waste water, Darsaklis still experienced some problems. Karubas always responded to the complaints of Seng and Darsaklis and took action to repair any damage or stop any damaging flow of water.

In 1982 Karubas gave up his lease, and Schildts leased the east half of the section from Lambert. Just prior to this, Darsaklis installed a center pivot irrigation system on the Darsaklis land, at a cost of $65,000. The pivot was installed to increase irrigable acres, increase the efficiency of the application, reduce or eliminate irrigation waste water, and reduce manhours. During the 1982 irrigation season, the irrigation waste water and silt from Schildts' farming operation bogged down and restricted the operation of the Darsaklis center pivot, eroded gullies, and created marshy conditions, which made general farming and harvesting difficult on the Darsaklis land.

In summary, this case is an attempt to enjoin Schildts and Lambert from discharging irrigation waste water over the Darsaklis land. Schildts and Lambert claim they have a right to do so under an oral agreement between Maude Lambert and Glau, the predecessor in title to Darsaklis. It is the Darsaklis claim that the alleged agreement violates the statute of frauds. The parties are in tacit understanding that Schildts and Lambert have no right to discharge waste water across the Darsaklis land unless they have an easement, either by agreement or prescription to do so—a soundly based understanding. See *Eunice Harrington Investments, Ltd. v. Wallace*, 207 Neb. 373, 299 N.W.2d 174 (1980).

An easement, under Nebraska law, is an interest in real estate which permits the use of another's land for a specified purpose. *Voltmer Family Farms v. Board of Equal.*, 216 Neb. 396, 343 N.W.2d 755 (1984). It is such an interest in land that is subject to the requirements of the statute of frauds.

Nebraska's statutes concerning conveyances and contracts relating to real property are set forth in Neb. Rev. Stat. §§ 36-103 to 36-107 (Reissue 1978). In general, these statutes provide that no interest in land may be created or granted unless, as set out in § 36-103, "by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same." The only exception to this general rule is that set out in § 36-106, which states: "Nothing contained in sections 36-101 to 36-106 shall be construed to abridge the powers of a court of equity to compel the specific performance of agreements in cases of part performance."

In this case the parties agree that an easement, or an agreement for an easement, was never signed. The defense presented by Schildts and Lambert requires the establishment and proof of an oral contract declared void by the statute of frauds. § 36-103. Such an oral contract is unenforceable unless the evidence is sufficient to satisfy the requirements of § 36-106.

As stated in *Anderson v. Anderson*, 150 Neb. 879, 891-92, 36 N.W.2d 287, 293 (1949):

> In order to satisfy the requirements of this section [§ 36-106] the burden was upon plaintiffs to prove an oral contract the terms of which were clear, satisfactory, and unequivocal, and also part performance, and that the acts done in performance were referable solely to the contract sought to be enforced . . . so that nonperformance by the other party would amount to a fraud upon him.

See, also, *Yates v. Grosh*, 213 Neb. 164, 328 N.W.2d 200 (1982).

In the instant case there is no real disagreement that there was partial performance by the Lambert interests in advancing money to help defray the cost of building the two culverts. The evidence shows that the federal government paid the bulk of the cost but that Maude Lambert did contribute some $600 in 1969.

There is no evidence, however, to tie this performance to any particular agreement. In order to satisfy the requirements of an exception to the hearsay rule, and establish an oral easement in real estate, a second prong of the test must be met—the terms of the oral contract must be "clear, satisfactory, and unequivocal." See, *Anderson v. Anderson, supra; Yates v. Grosh, supra.*

Both the Schildts and Lambert contend there was a partly written, partly oral agreement in 1969 between William Glau and Maude Lambert. Maude Lambert's decisions in any discussions or agreements with Glau were those made by her agents, the employees of the farm management company managing the Lambert farm in 1969. In that year Robert Buecker was the local manager representing Maude Lambert, as he had been since 1960 and continued to be until 1972. Buecker testified in the case as to conversations with Glau concerning waste water. Buecker testified, from memory refreshed by his letters written to Maude Lambert in May of 1966, that in the fall of 1965 Glau complained to Buecker about waste waters and Buecker cooperated in correcting the problem. Buecker wrote:

> Last fall Bill Glau approached me about sharing in the cost to correct this situation before the 1966 irrigation starts. The deal is: either go along with him or he can force us to keep our irrigation water from going through his land, and this would be a difficult job. While in Omaha last fall, this matter was taken up with you and you thought we just as well share the cost and keep good relationship with Mr. Glau. The job is completed and your share of the total cost was $250.

In September of 1969 Buecker signed a "Pooling Agreement" as agent for Maude Lambert. Glau also signed the agreement. The pooling agreement stated only that a "Channel & Gulley" and "Sod Waterway" were to be constructed on the Glau land and that "Costs will be shared 50 - 50 between owners." Later, on January 29, 1970, Buecker wrote a letter to Lambert indicating that the government had paid $2,332 and that the Lambert estate's share was $588.04, and stating:

> Since this is completed now, Mr. Glau will give us an easement . . . . According to the State Law, he could keep

this from letting our water go through his farm except for rain water and melting snow . . . . But irrigation waste water must be controlled by the people that are using it; an easement hasn't been drawn up to date, but we plan to go to an Attorney's Office to have this taken care of . . . .

When asked if he had any idea whether Glau ever gave an easement, Buecker testified: "Gave us one? No." Such testimony indicates disagreement on an easement, not agreement.

Albion Visser succeeded Buecker as farm manager in 1971. Visser testified that he did not talk to Glau about waste water problems. In August of 1972 Visser wrote to Lambert, concerning the easement, as follows:

EASEMENT. Last spring I contacted Mr. Bill Glaugh [sic] about an easement for the water to go through his place. Mr. Glaugh [sic] did not give me an easement because it should have been done in 1969 and he was very reluctant about giving me one at that time. As you have noticed on your visit everyone more or less respects each others [sic] property and rights so I would not recommend any easement at this time in writing. I feel that it is necessary to have good common sense and respect of other people's property rather than an easement.

It is clear that the oral easement relied upon by Schildts and Lambert had to arise from an oral agreement between Buecker, acting for Maude Lambert, and Glau in 1969. The only other direct testimony as to this agreement comes from William Glau. Glau testified that he contributed to the cost of the cement culvert because, "Well, we had to do something to try to — to leave those people off the hook, and when we put it in — get this down straight — we agreed to take a reasonable amount of water, but not enough to do any damage."

In later testimony Glau testified:

Well, the situation is this. Now you run me right up in a corner here on this deal that far back and them documents, and what we were doing at that time was just trying to keep peace between, live and let live with them farmers up there, and the idea was this. We just put that in there to take a reasonable amount of water, but not

enough to do any damage.

Later, Glau testified:

And at different times of the year you could take more water, but the simple reason was — don't get away from this — we put it in there as a live-and-let-live proposition, a reasonable amount of water, but not enough to do any damage.

It is clear, then, that the only agreement shown in the evidence in this case is an agreement by Glau to try to get along with his neighbors, to "live-and-let-live," and "to take a reasonable amount of water, *but not enough to do any damage*." (Emphasis supplied.) When an agreement is so limited as by the words "but not enough to do any damage," the agreement is conditional and not unequivocal as required by *Anderson v. Anderson*, 150 Neb. 879, 36 N.W.2d 287 (1949), and *Yates v. Grosh*, 213 Neb. 164, 328 N.W.2d 200 (1982). Such a limited permissive use is a far different thing from George Schildt's view of the situation as expressed to George Darsaklis: "Well, according to the law, I can spill the water on you and nobody can stop me."

The limited or conditional nature of the arrangement is clear throughout all the evidence. In 1965 Maude Lambert paid $250 for some temporary work in order to "go along with him or he can force us to keep our irrigation water . . . ." In 1969, the year in which the purported oral easement was granted, Maude Lambert's agent testified unequivocally that Glau did not give them an easement but that they would try to get one. In 1972 a new agent wrote William Lambert "that it is necessary to have good common sense and respect of other people's property rather than an easement." Throughout the years up to 1982 when George Karubas farmed the Lambert land, Karubas made constant changes in his farming operation at the complaint of Glau about waste irrigation water. Karubas changed the size of his irrigation tubes, the width of his rows, installed trench cleaners, acquired new ditching equipment, and "kept up a pretty good vigil of watching and pulling ditches to make sure the water did not run all over, roughshod, all over the place into the irrigation ditches."

There is no testimony in this record as to any unequivocal

easement granted by William Glau. There is no testimony as to the duration of any easement nor as to the maintenance of the waterways involved. The most that Glau did was to act in a neighborly fashion and accept limited quantities of water upon the repeated condition "that it do no damage." Such a limited agreement is no more than allowing a permissive use. Glau always maintained the position that he was being neighborly and that no one was using the Glau land as a matter of right. No one ever asserted a right against Glau.

The facts are comparable to those stated in *Bone v. James*, 82 Neb. 442, 445, 118 N.W. 83, 85 (1908), where we said:

It is quite apparent from the whole testimony that the use of this road or way was commenced and continued by Meredith under license or permission from the plaintiff, and that no claim of right was ever asserted until made by the defendant a short time prior to commencement of this action.

Here, the only claim of right is that expressed by Lambert to his agent in 1981, and never expressed to Glau, and by George Schildt in 1982. Schildts and Lambert have failed to prove any oral easement.

The foregoing discussion also disposes of Lambert's cross-appeal seeking a prescriptive easement. *Gerberding v. Schnakenberg*, 216 Neb. 200, 204, 343 N.W.2d 62, 65 (1984), states: "The general rule is that if a use begins as a permissive one, it retains that character until notice that the use is claimed as a matter of right is communicated to the owner of the servient estate."

In view of this disposition of the case, the remainder of the Darsaklis assignments of error need not be discussed.

For all the foregoing reasons the trial court's dismissal of the Darsaklis petition is reversed, and the trial court is directed to grant the injunction prayed for by Darsaklis. The trial court's dismissal of Lambert's cross-petition seeking to quiet title in an easement over the Darsaklis land is affirmed, and the granting of an easement to Lambert is reversed.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.