RALPH L. ROMSHEK AND BETTY J. ROMSHEK, APPELLEES AND CROSS-APPELLANTS, V. FRANCIS E. OSANTOWSKI ET AL., APPELLANTS AND CROSS-APPELLEES.

466 N.W.2d 482

Filed March 8, 1991. No. 88-746.

George H. Moyer, Jr., of Moyer, Moyer, Egley, Fullner & Warnemunde, for appellants.

Barry L. Hemmerling, of Jeffrey, Hahn, Hemmerling & Wade, P.C., for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The defendants appeal from a mandatory injunction entered against them by the district court, an order directing a prospective monetary penalty, and a judgment for damages in favor of the plaintiffs.

In an appeal of an action in equity, this court tries the factual issues raised by the appellant's assignments of error de novo on the record and reaches its conclusions independent of the findings of the trial court; however, where credible evidence is in conflict on material issues of fact, this court may consider and give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. Neb. Rev. Stat. § 25-1925 (Reissue 1989); *Uhing v. City of Oakland*, 236 Neb. 58, 459 N.W.2d 187 (1990).

In the de novo review, this court is guided by the rule that a party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle him

or her to relief. *Uhing v. City of Oakland, supra*.

The plaintiffs, Ralph L. and Betty J. Romshek, are the owners of the northeast quarter and the east half of the northwest quarter of Section 8, Township 16 North, Range 2 West of the 6th P.M., in Butler County, Nebraska. The defendants, Francis E., Ernest J., and Leo J. Osantowski are the owners of the northwest quarter of Section 9, Township 16 North, Range 2 West of the 6th P.M., in Butler County, Nebraska. The Osantowskis' property is located directly east of the Romsheks' property. The two farms are separated along their common boundary by a township road which extends north to the Platte River.

There are three water drainageways that are important in a discussion of this case.

First, there is a manmade watercourse, referred to as the creek or the drainage ditch in the testimony of the various witnesses. It enters the plaintiffs' farm at the southwest corner and flows east-northeast, crossing the township road approximately 412 feet north of the parties' south property lines. That drainage ditch extends onto the defendants' land in an east-northeast direction for some distance and then formerly headed diagonally in a northeasterly direction.

That drainage ditch drains a large tract of land southwest of both the defendants' and plaintiffs' land. A dike runs along the north side of the ditch, beginning on the property upstream from the plaintiffs' land and extending downstream through the defendants' land until the point where the drainage ditch cut diagonally across the defendants' land. A wooden bridge spans the drainage ditch at the point where the ditch crosses the township road.

Second, there is a natural drainageway which the plaintiffs claim is located approximately 200 feet north of the south end of the wooden bridge and which runs generally west to east across plaintiffs' farm. According to the testimony of Ralph Romshek and others, this drainageway passes through a 48-inch culvert under a township road where a bridge was at one time located, across adjoining land onto plaintiffs' land and, in past years, through two culverts beneath the township road separating the plaintiffs' and defendants' land, and east

across the defendants' property to the drainage ditch. The two culverts mentioned above extend east and west beneath the township road separating the plaintiffs' and defendants' land and permitted the water to pass under the road on its natural course. One culvert is a 24-inch reinforced concrete pipe. The other culvert is located 8 feet north of the concrete culvert and is a 48-inch corrugated metal pipe "squash" culvert. The concrete culvert has been in place since prior to 1948. The metal culvert was installed during the 1960's.

Whether this second-described drainageway ever existed in such a way as to flow east from the township road and across defendants' property is one of the major issues in this case.

The third drainageway is a natural watercourse which the parties and witnesses call the Platte River overflow. It extends from the plaintiffs' farm across the township road in a southeasterly direction and thence easterly across the defendants' farm at a point approximately 1,600 feet north of the south end of the township road bridge over the drainage ditch.

Romshek described the overflow as coming out of the Platte River in an easterly direction through his east pasture. In some places the overflow is 8 feet deep and 20 feet wide. Romshek continued, stating that the Platte River overflow crosses the township road through a 48-inch (actually a 54-inch) squash culvert. Once it passes through the culvert, the overflow is on the defendants' land. Romshek testified that before the defendants' land was leveled, the overflow went through a hay meadow and was 6 or 7 feet deep, but was wider than on the plaintiffs' land.

There is no dispute regarding the first of these three drainageways. The controversy focuses on the last two.

The plaintiffs alleged in their amended petition that when the defendants leveled their land in 1976 or 1977, a natural drainageway was blocked, thereby causing water to accumulate on plaintiffs' land, which damaged their crops. This was the second drainageway described above, which, according to the plaintiffs, found its way onto defendants' land through the two culverts.

Romshek testified that heavy rains in 1982 and 1986 resulted

in crop damage. He stated that crops would drown if under water for 2 or 3 days. He further testified that as a result of the obstruction in the drainageway caused by the defendants' raising the west side of their land during the leveling process, the water did not drain off his land and instead remained there for several days, which caused the crops to drown.

Romshek testified that prior to the leveling of the defendants' land, there were no road ditches. The land on both the east and west sides of the road were about level with the township road. The road, he said, was slightly higher at the point of the two culverts to allow the road to pass over them.

Testifying further, Romshek stated that prior to the leveling by the defendants, the second drainageway passed over his property starting at the west end, moved in a generally easterly direction to the two culverts, went through the culverts to the defendants' land, and crossed defendants' land until it reached the drainage ditch. The second drainageway was described by Romshek as a "natural drainway that was a foot or two deep and it didn't go in a straight line, it meandered through the farm and it drained local water off of this farm." He further described local water as the water off the "river bottom ground" and as rainwater. The width of the drainageway was approximately 12 to 15 feet, but the drainageway could get much wider after a heavy rain. Romshek stated that the water flowed in an easterly direction.

Romshek stated that the water drained from the property to the west of his property, as well as from his own. The drainageway ran east across plaintiffs' land, through the culverts, and into "something like a swale that was probably a foot or two foot deep" and "fifteen to twenty feet wide" on the defendants' land just east of the two culverts.

Plaintiffs presented other witnesses who testified regarding the natural drainageway. The first of these witnesses was Gerald McDonald, a road maintainer for Savannah Township, which township encompasses the township road separating the parties' land. McDonald testified that he has been a road maintainer since 1948. During that time he has been up and down that road on the average of twice a month, at speeds of less than 10 miles per hour.

McDonald further testified that there was a swale running east from the two culverts. The swale was described as 1½ to 2 feet deep and 10 to 12 feet wide. The swale extended into the field and ran beside some trees and beyond. At a time when only the concrete culvert was in place, McDonald testified, during heavy rainfall water would run over the road in the approximate location of the culverts.

There was additional testimony from McDonald that even after the pasture on defendants' land was plowed and farmed, the water flowed in the same pattern. He testified further that the swale remained until the defendants leveled their field. Once the field was leveled, the elevation was changed. The defendants' field, according to McDonald, was about 1½ to 2 feet higher than the township road.

Joe Mick, a retired farmer, also testified as to the existence of the swale. Mick said that there was a swale located just east and west of the two culverts. The path of the water was west to east from plaintiffs' land, through the culverts, and across defendants' land. Mick also noted the trees that McDonald had previously pointed out as formerly being located on the defendants' land.

The swale was described by Mick as approximately 1½ feet deep and 15 to 20 feet wide. The swale was still there after the field was plowed for farming. Mick stated that the swale ran east until it met the drainage ditch.

Kenneth Ebel, a farmer from the area, also testified concerning the swale. Ebel had helped the previous owner of the defendants' land, Art Ronkar, put up hay and had also combined his corn 1 year on that same parcel of land. Ebel testified that he observed a "low area" or a "swale" in the area directly east of the culverts. Ebel described the swale as 1 to 1½ feet deep and between 10 and 15 feet wide, with sloping sides. That area was "farmed through." The water would run from the field on the west, through the culverts, and then east-northeast to the drainage ditch.

Joseph Proskovec, an engineer and an earth-moving contractor, also testified. He leveled the defendants' land. Proskovec explained the survey made. The rod readings were taken at 100-foot intervals in a grid pattern. No effort was

made to find the lowest spot in the field.

Proskovec used the survey map to show a low area running west to east originating near the culverts and ending at the drainage ditch. The path takes into account only the actual rod readings; thus it is only a general representation of the depression.

Defendants all deny the existence of the swale, and all three of them testified that there was not a swale or low spot east of the two culverts. However, Leo Osantowski testified in a deposition that the water ran through the culverts, hooked to the north, and then headed east into the defendants' field and eventually into the drainage ditch.

William O'Callaghan was called to testify for the defendants. He used to travel the township road on his way to and from work and said that he had never seen a swale or low spot east of the two culverts.

Richard Walsh, a sanitary engineer, was called as an expert witness by the defendants. Walsh testified that he examined the area, topographical map, aerial photographs, and other exhibits. He concluded that there was not a swale east of the two culverts. Walsh did state on cross-examination that the topographical map did indicate one of several low spots just east of the approximate location of the two culverts. His examination took place more than 10 years after the defendants leveled this land in 1977.

Plaintiffs also alleged in their amended petition that when defendants leveled their land, they blocked the third drainageway previously mentioned, the Platte River overflow. A 36-inch culvert had been inserted into the ditch that defendants had created to carry the flow of water from the Platte River overflow to the east of the defendants' property. The defendants placed a floodgate over the west end of the culvert to control the water passing through the culvert. Not only was the culvert too small to allow the necessary volume of water to pass through, but the floodgate on the culvert was down and silted shut until the time of this lawsuit.

There were many aerial photos of the area, one dated as early as 1938, as well as many pictures of standing water and residue from flooding, which were helpful in determining the existence

of the swale or natural drainageway. The exhibits also showed the Platte River overflow and the obstructions placed there by the defendants. Photographs indicated the presence of the drainageway north of the bridge in the area where plaintiffs claim the swale or natural drainageway existed. The fact that there were two culverts in this location would tend to indicate that ordinarily a fairly large quantity of water passed through this point. Based upon the exhibits, the testimony, and a visual inspection by the trial court, as related in its order, the trial court concluded that there was a natural drainageway east of the two culverts across defendants' land.

The district court entered judgment in favor of the plaintiffs. The court ordered the following to be done within 90 days: (1) the dirt east of the two culverts be removed to create a ditch equal in elevation to the bottom of the lowest culvert, 8 feet wide and 1,000 feet long, due east of the two culverts, with a slope of .1 foot for every 200 feet, and (2) the dike, culvert, and floodgate located on the Platte River overflow be removed and other dirt be removed to create a ditch equal in elevation to the bottom of the 54-inch squash culvert, 8 feet wide and 500 feet long, due east of the culvert, with a slope of .1 foot for every 200 feet. The court further ordered that the defendants comply with the two directives within 90 days and that failure to so comply would result in civil contempt, with a penalty of $500 per day for each day thereafter that the defendants did not comply. The court also ordered money damages be paid to the plaintiffs in the amount of $4,300.

The defendants assign as error the court's order that defendants regrade the Platte River overflow, the court's finding that a natural drainageway exists in the area of the two culverts across the township road, the court's order that the defendants be required to excavate a ditch 8 feet wide and 1,000 feet long to begin at the elevation of the lower of the two culverts beneath the township road, the court's determination that weather data showing that the 1982 and 1986 rainfall exceeded the average annual rainfall by 20 inches or more not be received in evidence, the court's order that plaintiffs be awarded money damages, and the court's order that defendants were to pay a penalty of $500 per day if they failed to remove the

dirt and dike within 90 days. Plaintiffs cross-appeal, assigning as error that the court did not order the defendants to remove the dirt from the swale and the Platte River overflow to create ditches extending to the drainage ditch. We review this case de novo on the record.

The first three assignments of error will be considered together. The nature of the water must be determined—whether it is diffused surface water or flows in a natural watercourse or a drainageway—to ascertain which rule to apply to the drainage of that water.

Diffused surface water is defined as "water which appears upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, which ordinarily results from rainfall or melting snow." *Gruber v. County of Dawson*, 232 Neb. 1, 9, 439 N.W.2d 446, 453 (1989); *Shotkoski v. Prososki*, 219 Neb. 213, 362 N.W.2d 59 (1985); *Sullivan v. Hoffman*, 207 Neb. 166, 296 N.W.2d 707 (1980). A watercourse is defined as "[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook . . . ." Neb. Rev. Stat. § 31-202 (Reissue 1988).

There are occasions when surface waters are concentrated in force and volume to form a natural drainageway other than a watercourse. In these instances the rules relating to diffused surface water as a common enemy do not apply. *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985). Thus, a watercourse is a drainageway, but the converse is not necessarily true. *Id.*; *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962). A natural drain does not have to have all of the attributes of a watercourse, but it is required to have some of the attributes of a watercourse. *Shotkoski v. Prososki, supra*; *Barry v. Wittmersehouse*, 212 Neb. 909, 327 N.W.2d 33 (1982).

A natural drainageway is formed when diffused surface waters concentrate and accumulate in volume so as to lose the characteristics of diffused surface water and flow into a well-defined course, whether it be a natural depression, swale, ditch, or draw in its primitive condition, and whether or not it is 2 feet below the surrounding land. *Gruber v. County of Dawson, supra*; *Holman v. Papio Nat. Resources Dist.*, 228

Neb. 94, 421 N.W.2d 430 (1988); *Belsky v. County of Dodge, supra*; *Shotkoski v. Prososki, supra*. The flow of water in a natural drainageway cannot be interfered with to the injury of a neighboring proprietor. *Belsky, supra*; *Town of Everett v. Teigeler*, 162 Neb. 769, 77 N.W.2d 467 (1956).

The current Nebraska rule regarding diffused surface water was announced in the leading case of *Nichol v. Yocum, supra*. In *Nichol*, the court rejected the common enemy doctrine and instead accepted the common-law rule. The court summarized the rule on avoidance of diffused surface water as follows:

> [D]iffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. But when diffused surface waters are concentrated into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply. . . . "[A] natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage channel or depression. Thus, it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all the waters which may be reasonably anticipated to drain therein, and that this is a continuing duty."

*Nichol v. Yocum, supra* at 306, 113 N.W.2d at 200. See, *Gruber v. County of Dawson, supra*; *Belsky v. County of Dodge, supra*; *Shotkoski v. Prososki, supra*; *Krafka v. Brase*, 218 Neb. 335, 353 N.W.2d 276 (1984); R. Harnsberger & N. Thorson, Nebraska Water Law & Administration § 4.06 (1984).

The water flowing through the two culverts has several characteristics of diffused surface water. Ralph Romshek testified that the water was "local water" which was drained off the river bottom ground and was rainwater. However, the water loses some of the characteristics of diffused surface water when it enters the swale on the southern portion of the plaintiffs' land, passes through the two culverts, and heads east toward the drainage ditch. The water now forms a natural drainageway

because of the regularity in the course the water takes and the concentration of the volume of water. In addition, the drainageway makes its way to the drainage ditch, which has a continuous stream of water. Thus, it takes on more characteristics of a natural drainageway.

The court in *Nichol* stated that the controlling factor is not whether water is present in the drainageway at all times; rather, the controlling factor is whether the course the water uniformly takes is temporary or occasional. Romshek and several witnesses testified that every time there was a heavy rain, the water drained toward the swale. The course the water took was always along the same path. While it is true that water was not always present in the swale, this is not a controlling factor. The water ran consistently on the same path through the swale. This is the controlling factor.

The evidence establishes that the water that passed through the two culverts was not diffused surface water. The water has collected and combined in volume to flow into a depression or swale through which it flows in a state of nature.

Defendants make much of the fact that the water flows in a ditch and through the concrete and corrugated metal culverts, none of which are natural features. The court in *Gruber v. County of Dawson*, 232 Neb. 1, 8, 439 N.W.2d 446, 452 (1989), stated that " 'the mere presence of an artificial element in a drainageway does not destroy its characterization as a natural drainageway. It is only where an essential part of the drainageway is artificial or manmade that such characterization may be precluded.' " (Quoting *Holman v. Papio Nat. Resources Dist.*, 228 Neb. 94, 421 N.W.2d 430 (1988).) Despite the construction of the ditch and the presence of the two culverts, the water was carried across the defendants' land from the same entrance to the same exit. This is evidenced by the testimony that in extremely heavy rain the water crossed the road about 50 feet north of the two culverts, found its way to the swale, and continued east to the drainage ditch. The water did not cross at the two culverts because the road is higher at that point to provide for the culverts. However, the water crossed at a low point in the road close to the location of the two culverts. Thus, the presence of the artificial features did not

change the path of the natural drainageway on the defendants' property.

Defendants also argue that when the plaintiffs leveled their own land, the plaintiffs eliminated all traces of the natural drainageway on their property, and thus they should not prohibit defendants from doing the same thing.

This argument can be answered with reference to the case of *Stuthman v. Adelaide D. Hull Trust*, 233 Neb. 586, 447 N.W.2d 23 (1989). The *Stuthman* case involved a natural basin or depression. The east ridge of the depression, which was the highest point, was about 2 feet higher than the lowest point of the depression. Surface waters accumulated in the depression on a temporary basis only.

A drainage ditch was dug to facilitate drainage by preventing surface water from accumulating in the depression. The ditch, which was located entirely on the defendants' property, emptied into a natural drainage course also located on the defendants' property. The natural drainage course continued through a drainage culvert, onto the plaintiff's property, and into a creek. The plaintiff complained that the excess drainage caused wet areas on her land. The trial court dismissed the petition.

This court relied on Neb. Rev. Stat. § 31-201 (Reissue 1988), which provides:

> Owners of land may drain the same in the general course of natural drainage by constructing an open ditch or tile drain, discharging the water therefrom into any natural watercourse or into any natural depression or draw, whereby such water may be carried into some natural watercourse; and when such drain or ditch is wholly on the owner's land, he shall not be liable in damages therefor to any person or corporation.

The court stated:

> "An owner of land has the right in the interest of good husbandry to drain ponds or basins thereon of a temporary character, and which have no natural outlet or course of flow, by discharging the waters thereof by means of an artificial channel into a natural surface-water drain on his own property, and through such drain over the land of another proprietor in the general course of

drainage in that locality, even though the flow in such natural drain is thereby increased over the lower estate, and provided that this is done in a reasonable and careful manner and without negligence."

*Stuthman, supra* at 590-91, 447 N.W.2d at 27, quoting *Aldritt v. Fleischauer*, 74 Neb. 66, 103 N.W. 1084 (1905). Accord *Pospisil v. Jessen*, 153 Neb. 346, 44 N.W.2d 600 (1950).

A further principle was applied in the *Stuthman* case, wherein the court stated:

"An owner has the undoubted right to protect his land from mere surface water and, in the interest of good husbandry, to drain lagoons or basins thereon of a temporary character, by discharging such surface waters by means of artificial channels into a natural surface water drain and through such drain or channel on and over the land of another, provided such person acts in a reasonable and careful manner and without negligence, and the injury, if any, resulting therefrom to such lower proprietor by reason of the increased flowage in the natural surface water drain will be accounted *damnum absque injuria*. For negligence in the manner of accomplishing the improvement, such owner is responsible and accountable to those injured by his negligent acts."

*Stuthman, supra* at 591, 447 N.W.2d at 27, quoting *Todd v. York County*, 72 Neb. 207, 100 N.W. 299 (1904).

The court in *Stuthman* applied the above principles and held that the defendants could construct a ditch to drain the surface waters from their land into a natural draw or surface drain. The court found that at no time did the water leave the natural course of drainage, other than on the defendants' own land. Since the ditch was constructed entirely on the defendants' land, the defendants were not liable for damages. The defendants' actions in creating a ditch were found to be protected by § 31-201 and the precedent cited above.

The leveling performed by the plaintiffs in the case at bar is not so different from the ditch constructed in *Stuthman v. Adelaide D. Hull Trust*, 233 Neb. 586, 447 N.W.2d 23 (1989). The basin in *Stuthman* is described similarly to the swale in this

case. The plaintiffs in this case also created somewhat of a ditch in the leveling project. The plaintiffs leveled their land to drain to the east, and ran their crop rows in that same direction. The crops were irrigated by the water flowing down the rows. In essence, small ditches were created between the rows to irrigate the crops. As the water reached the east side of the plaintiffs' field, it entered into the natural drainageway and passed through the culverts onto the defendants' land. Eventually the water made its way to the drainage ditch.

In comparing this case to *Stuthman*, it can be inferred that any leveling by the plaintiffs was permitted, provided the water exited their land in the natural drainageway. Plaintiffs will not be liable for any damages to the landowners downstream, including the defendants, for draining the waters into a natural drainageway that begins on their own property, as long as this is done in a reasonable and careful manner. See *Stuthman, supra*.

Plaintiffs have drained the water off their field in such a way that they have not been negligent. The water drains generally west to east to the culverts. The water is not forced upon the defendants' land in great volume, it flows at a natural pace. Furthermore, the leveling done by the plaintiffs did not change the point where the swale enters the defendants' land. The court in *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962), stated that an upper proprietor may change the course of surface water on his own land by ditch or embankment, provided that the upper proprietor does not alter the point at which the water exits his land. Therefore, the leveling of the plaintiffs' land did not alter the status of the water in the natural drainageway.

Defendants allege that the plaintiffs have leveled their land to drain to the southeast corner. They further allege that if the dike was not present on the north side of the drainage ditch, the water would flow off the plaintiffs' land into the drainage ditch and thus eliminate the problem. They contend that the reason the southeast corner is not draining is a combination of the leveling of the plaintiffs' land, the presence of the dike on the north side of the drainage ditch, and the low elevation of the southeast corner. This does not explain why the plaintiffs did not have the drainage problem they presently have prior to the

defendants' leveling their field.

In order for the plaintiffs to prevail under their theory that the leveling of the field obstructed a natural drainageway, they must show by a preponderance of the evidence that the drainageway traversed the road and defendants' land before the road was altered and the defendants leveled their land, that the drainageway was formed and existed in a state of nature, and that it carried water from a higher estate to a lower estate. *Gruber v. County of Dawson*, 232 Neb. 1, 439 N.W.2d 446 (1989); *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985).

Plaintiffs' evidence is persuasive that the drainageway would cross the road even without the culverts and that prior to the leveling the water would have continued east to the drainage ditch. Further, the evidence supports the conclusion that the drainageway was formed and existed in a state of nature. The artificial elements do not destroy the characterization as a natural drainageway. Lastly, the plaintiffs have shown that the water is draining from a higher estate to a lower estate.

This court has continuously stated that where the trial court has viewed the premises, this court is required to consider any competent and relevant facts revealed by the view and any findings made by the court, provided that the record contains competent evidence to support the findings. *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985); *Burgess v. Omahawks Radio Control Org.*, 219 Neb. 100, 362 N.W.2d 27 (1985); *Darsaklis v. Schildt*, 218 Neb. 605, 358 N.W.2d 186 (1984). See, also, *Holman v. Papio Nat. Resources Dist.*, 228 Neb. 94, 421 N.W.2d 430 (1988); *Grint v. Hart*, 216 Neb. 406, 343 N.W.2d 921 (1984); *Barry v. Wittmersehouse*, 212 Neb. 909, 327 N.W.2d 33 (1982); *Jameson v. Nelson*, 211 Neb. 259, 318 N.W.2d 259 (1982).

The order entered by the trial court on May 26, 1988, states that the court conducted a drive-by inspection of the properties and the township road separating the properties on March 9, 1988. The court's order continues with a "Findings of Fact" stating the observations and the findings made by the court as a result of the premises view, as well as other findings of fact deduced from the testimony and evidence. The findings of fact,

set out in part, are as follows:

Exhibits 1, 2, 11, 12, 100, 401, 402, 413 coupled with the testimony of Ralph Romshek, Jerold [sic] McDonald, Joe Mick, Kenneth Ebel, Joe Proskovec and premises view conclusively establish two natural drainways and one man made drainway that run generally west to east from plaintiffs' property onto and across defendants' property.

The man made drainway is a drainage ditch that has been in place for 30 years or more located approximately 412 feet north of the South one-half section line as it passes from plaintiffs' property onto defendants' property undera [sic] bridge in the north-south township road which separates the two properties. There is no contention between the parties with regard to this drainway.

One of the other two natural drainways, hereafter referred to as drainway #1, runs generally west to east from plaintiffs' property onto and across defendants' property at a point approximately 180-200 feet north of the south edge of the bridge across the drainage ditch thru two culverts in the township road separating the two properties.

The other natural drainway, hereafter referred to as the Platte River overflow, runs generally west to east from the plaintiffs' property onto and across defendants' property at a point approximately 1600 feet north of the south edge of the bridge across the drainage ditch thru a 4 foot squash culvert in the township road separating the two properties.

Exhibits 11, 12, 35, and 36, the testimony of Ralph Romshek and Joe Proskovec, and the premises view establish that in 1976 the defendants undertook extensive leveling of their farm which resulted in fills of dirt as much as 1.5 ft. or 18 inches in drainway #1 along defendants' west property line immediately to the east of the two west-east culverts in the township road and extending easterly at various depths and widths for 1000 feet or more.

Leveling also resulted in fills of dirt as much at [sic] .5

ft. or 6 inches or more in the Platte River overflow along defendants' west property line immediately to the east of the [54] inch squash culvert in the township road and extending easterly at various depths and widths for at least 500 feet.

. . . [Defendants] also installed a flood gate attached to a 36" culvert thru the dike immediately to the east of the [54]" squash culvert in the township road as shown by Exhibits 38 and 39 and the premises view.

In *Johnson v. NM Farms Bartlett*, 226 Neb. 680, 683, 414 N.W.2d 256, 260 (1987), this court stated that "[s]ince the record in this case does not tell us what the judge saw nor what findings he made as a result of his view, we give no weight to the fact that he viewed some of the lands involved." Accord *Gruber v. County of Dawson*, 232 Neb. 1, 439 N.W.2d 446 (1989).

In *Johnson* and *Gruber* the court did not give any weight to the trial court's premises view because the findings reached as a result of the view were not set out. In the following two cases the court did set out its findings, and thus weight was given to the premises view. In *Krafka v. Brase*, 218 Neb. 335, 353 N.W.2d 276 (1984), this court gave consideration to the findings of the trial court as a result of the view of the premises. The findings of the trial court were stated as follows:

"The Court concludes that in a state of nature the water simply would not flow in the manner that the Plaintiff claims. The visual inspection of the Plaintiff's real estate indicated no particular source of drainage from the south. The Court is left with the conclusion that if there is water accumulating on the Plaintiff's land it is water that could be classified as surface water, which can be repelled by adjoining landowners . . . ."

*Id.* at 337-38, 353 N.W.2d at 278.

In *Jameson v. Nelson*, 211 Neb. 259, 318 N.W.2d 259 (1982), this court also gave appropriate weight to the fact that the trial court had viewed the premises. In that case the trial court found the following:

"2. That the original cut on the Jameson land in 1952 was to provide drainage of lagoons on the Nelson land directly to the north of the cut;

3. That water did drain to the south at the place of the cut prior to the cut being made;

4. That the new ditch will increase drainage flow through the old cut;

5. That the three dam structures in the draw below the cut do not have sufficient capacity to hold the additional drainage;

6. That this presents a danger to the crop land of the plaintiff below the dam sites."

*Id*. at 265-66, 318 N.W.2d at 263-64.

In the case at bar the trial court set forth the things it saw. In addition, the trial court found that the land had been leveled with fills of as much as 1.5 feet in "drainway #1," the swale, and that the land had been leveled with fills by as much as .5 foot in the Platte River overflow.

The trial court also stated the findings made as a result of the view of the premises. The trial court found that there were two natural drainageways common to both properties. The characterization of the waters as natural drainageways is very important to the plaintiffs' theory of the case. The trial court continued, describing the direction and path of the drainageways as they passed over the plaintiffs' property, through the various culverts, and onto the defendants' property.

The results of the trial court's findings are reaffirmed by the evidence in the record. In fact, the trial court specifically notes the exhibits and testimony which supported the findings and conclusions reached as a result of his view of the premises. *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985), and *Burgess v. Omahawks Radio Control Org.*, 219 Neb. 100, 362 N.W.2d 27 (1985), tell us that the record must contain competent evidence to support the findings made by the court in the premises view. The record does support the findings of the trial court. The fact that the trial court cites to exhibits and testimony in conjunction with the findings as a result of the premises view should not detract from the fact that the premises were viewed and findings were made as a result of that view. The exhibits and testimony cited should be considered support from the record for the findings made by the trial court as a

result of the premises view.

Injunctive relief may be granted to an adjoining landowner upon a proper showing that an obstruction in a drainageway or natural watercourse constitutes a continuing and permanent injury to that landowner. *Gruber v. County of Dawson, supra.* Plaintiffs have shown that the obstruction of the natural drainageway will continue to harm them. The water cannot flow through the swale on its path to the drainage ditch, thereby causing the water to build up on the plaintiffs' land and destroy the crops growing thereon. The swale is a natural drainageway and defendants have no right to dam, divert, or otherwise repel water that flows through said drainageway. Thus, the injunctive relief was properly granted to prohibit the defendants from obstructing the natural drainageway.

The Platte River overflow is clearly a watercourse as defined by § 31-202. The overflow is over 2 feet below the surrounding land and has a continuous outlet to a stream of water. The Platte River overflow is sometimes dry. However, the court in *Northport Irr. Dist. v. Jess*, 215 Neb. 152, 337 N.W.2d 733 (1983), noted that a watercourse could sometimes be dry and that it need not flow continuously. Thus, the Platte River overflow is a watercourse.

The defendants do not dispute the portion of the trial court's order which requires them to remove the floodgate and culvert that they built into the Platte River overflow. The defendants do object to the portion of the order which requires them to regrade the Platte River overflow on their property to the same elevation as the bottom of the 54-inch squash culvert.

The flow of water cannot be interfered with to the detriment of the upper proprietor. *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985). The defendants have admitted that they have tampered with the flow of the Platte River overflow. This has resulted in water's backing up on the plaintiffs' land, damaging their pastureland. The trial court was correct in granting the injunction to prohibit the defendants from obstructing the flow of the Platte River overflow. The defendants can make changes in the course on their own land, provided the watercourse continues to take the same flow of water as before.

At this point, the cross-appeal will be discussed in conjunction with defendants' assigned errors regarding the ditches that were ordered to be created. Plaintiffs argue that the ditches are insufficient because they do not extend to the drainage ditch, as the swale and the Platte River overflow formerly did. When the land was leveled, the diagonal portion of the drainage ditch was removed. The drainage ditch now extends east to the east property line of the defendants. Plaintiffs argue that the new ditches will be inadequate to hold the water draining from their property.

Defendants argue that the ditches they are ordered to make are much deeper than before the leveling. The defendants point to a survey map to show that the amount of dirt added to the area where the swale and the Platte River overflow are located is much less than the amount of dirt they will now be forced to remove. Further, they will now be forced to have two large ditches in their property.

Both arguments are correct; however, the judgment is sound. While it is true the ditches are much deeper than the previous drainageways, they are also much shorter. Defendants will have ditches on their property, but they will not extend the entire length that they did before. Plaintiffs get shorter drainageways, but much deeper drainageways. The solution appears to be a compromise to provide adequate drainage while allowing the defendants to enhance the productivity of their property. Therefore, the assignments of error regarding the ditches to be created on the defendants' property are without merit.

The defendants' next assignment of error is the failure of the trial court to receive into evidence rainfall data. The court stated in *Johnson v. NM Farms Bartlett*, 226 Neb. 680, 691, 414 N.W.2d 256, 265 (1987), that

> where water from another source has been added to water from a source for which a defendant is liable, and the combined waters cause damage, it is incumbent upon the plaintiff to establish either that his or her entire damages would have occurred from the water for which the defendant is liable, or to establish the amount of the damages caused by the water for which defendant is liable.

Accord *Schmidt v. Chimney Rock Irrigation Dist.*, 209 Neb. 1,

305 N.W.2d 888 (1981). The rainfall data are clearly relevant to the measure of damages. The plaintiffs claim that their crops were drowned because water could not flow through the swale off their land. The rainfall data are necessary to determine if part of the crop would have drowned even if the natural drainageway was not blocked. The trial court should have considered whether the greater-than-average rainfall would have affected the drainage of the water in light of the fact that Romshek testified that water sometimes remained on the field overnight after a heavy rainfall before the defendants leveled their land. Thus, the failure to permit these data into evidence was error.

The next assignment of error is the award of damages. Defendants allege that the plaintiffs did not properly plead damages to their crops and pastureland. In paragraph 6, the plaintiffs' amended petition alleges that

sometime during 1976 or 1977, Defendants did move certain dirt upon their property and deposited the same in a fashion so that said natural drainway was obstructed and caused water to accumulate upon the property of the Plaintiffs immediately west of the culvert located under the public road that separates the Plaintiffs' land from the Defendants' land and through which such natural drainway flowed and such accumulation of water caused damage to the crops growing on said land.

The amended petition further alleged, in paragraph 3 of the second cause of action, that "such accumulation of water caused damage to the pasture land thereon . . . ."

Defendants argue that since crops are personal property and there is a specific measure of damages for injury to growing crops, the crop damages are special damages. Therefore, they argue that the amount of the special damages must be stated, pursuant to Neb. Rev. Stat. § 25-804 (Reissue 1989), which provides in part: "If the recovery of money be demanded, the amount of special damages shall be stated [in the petition]."

Plaintiffs failed to state the specific amount of money damages requested for the damage of their crops and pastureland. Defendants argue that this failure should preclude any evidence from being admitted regarding these special

damages.

Damages based upon the value of an unmatured crop are analogous to profits lost and are governed by the same rule precluding recovery in cases of either uncertainty or remoteness. *State v. Dillon*, 175 Neb. 350, 121 N.W.2d 798 (1963); *Patrick v. City of Bellevue*, 164 Neb. 196, 82 N.W.2d 274 (1957). The loss of profits expected upon transactions with third persons must be specially pleaded. C. McCormick, Handbook on the Law of Damages § 8 (1935). Thus, by analogy, damage to crops should also be specially pleaded. Plaintiffs failed to specially plead the damages to their crops.

Any error or defect in the pleading which does not affect the substantial rights of the adverse party must be disregarded. Neb. Rev. Stat. § 25-853 (Reissue 1989); *Gibbs v. Johns*, 183 Neb. 618, 163 N.W.2d 110 (1968). No substantial rights of the defendants were affected by the failure of the plaintiffs to state the amount of the damages to their crops. The defendants were aware from the petition that the plaintiffs intended to seek damages for the damage to the crops and the pastureland. Thus they were put on notice that they would have to defend the issue of damages and the amount thereof. Any other discrepancies in the notice given by the petition could have been cleared up by an appropriate motion.

In the case *Swick v. Cosler,* 194 Neb. 781, 235 N.W.2d 639 (1975), this court found that under the statutes which govern pleadings and service of process, the inclusion of a dollar amount for general damages was not jurisdictional. Any error by the plaintiff in stating a dollar amount of general damages did not affect any substantial right of the defendant. *Swick, supra*. The failure to state the amount of special damages should not be jurisdictional as well. In addition, if the defendant is aware of the damages he must defend, no substantial right of the defendant is affected. Thus, the proof of the damages should be permitted.

The general rule is that the measure of damages for the destruction of a growing crop is the value of the crop in the condition in which it existed at the time of its destruction. *Pulliam v. Miller*, 108 Neb. 442, 187 N.W. 925 (1922). The value of a matured crop may be proven by showing the market value,

less the necessary costs of harvesting, threshing, and transporting to market. *Kula v. Prososki*, 228 Neb. 692, 424 N.W.2d 117 (1988); *Pulliam v. Miller, supra*.

A more extensive list of factors to be taken into account in determining the value of a damaged crop is set out in *Hopper v. Elkhorn Valley Drainage District*, 108 Neb. 550, 188 N.W. 239 (1922). The value of the crop at the time of its injury or destruction is determined by taking into account the nature of the land; the type of crop planted; the kind of season, whether wet or dry; the yield of crops growing in such a season; the average yield of crops on neighboring land; the development of the crop at the time of destruction; the yield of a similar crop not injured; the market value of the crop as injured; the market value of the probable crop without injury; the time of the injury; the expense that would have been incurred if the crop had not been injured; the circumstances which surrounded the crop which may have resulted in the crop's not maturing; and all other circumstances illustrated by the evidence tending to establish such value. *Hopper v. Elkhorn Valley Drainage District, supra*.

The trial court did not admit evidence of rainfall. This is clearly relevant to the valuation of the crop. The trial court also did not take into account the cost of harvesting and transporting the crops to market. The valuation of the damage to crops is speculative at best; however, the trial court needs to examine all the circumstances surrounding the development, harvesting, and marketing of the crop to assure that as much speculation is removed as is humanly possible.

The trial court failed to consider several important factors in arriving at its decision. The determination of the valuation of the damages to the crops is reversed, and the cause is remanded with directions that the trial court permit the introduction of evidence to show the cost of the above-mentioned factors and any other factors which may affect the valuation of the crop.

Defendants' final assignment of error challenges the decree of the trial court giving the defendants 90 days to comply with the decree and imposing a penalty of $500 per day for each day thereafter that the drainage condition is not corrected. This court has held that a conditional judgment is wholly void

because the judgment does not perform in praesenti and the final effect is left to speculation and conjecture. *State v. Wessels and Cheek*, 232 Neb. 56, 439 N.W.2d 484 (1989); *Schoneweis v. Dando*, 231 Neb. 180, 435 N.W.2d 666 (1989); *Federal Land Bank of Omaha v. Johnson*, 226 Neb. 877, 415 N.W.2d 478 (1987); *Lemburg v. Adams County*, 225 Neb. 289, 404 N.W.2d 429 (1987). In the case *Lemburg v. Adams County, supra* at 292, 404 N.W.2d at 431, the court added that "final judgments must not be conditional, and unless there is an equitable phase of the action wherein it is necessary to protect the interests of [the parties], a conditional judgment is wholly void."

A judgment determines the rights and obligations which currently exist. It should not look to the future in an attempt to judge the unknown. The judgment entered by the district court attempted to do just that. The judgment called for a penalty for failure to comply with the decree within a limited period of time, 90 days. The failure to comply with the decree would be civil contempt. By placing the penalty within the decree, the trial court has entered a judgment based upon rights and obligations which are not currently in existence. The trial court has determined the outcome of the contempt charge and the penalty, prior to any wrongdoing by the defendants with respect to the decree.

The brief for the plaintiffs cites a case which the plaintiffs claim is very similar, *Kasparek v. May*, 174 Neb. 732, 119 N.W.2d 512 (1963). The case is similar in that both cases involve the removal of a dike and both cases also provide a time limitation for complying with the order. However, the cases differ in one significant respect. In *Kasparek*, the action for civil contempt was commenced after the time period had passed. The defendants in that case did not properly comply with the decree, and thus the civil contempt action was commenced. There was also no fine or penalty mentioned in the original decree for failure to comply.

The decree of the trial court should be modified to eliminate that portion which sets forth the penalty for civil contempt.

AFFIRMED IN PART AS MODIFIED, AND

IN PART REVERSED AND REMANDED.