IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GUSTAFSON V. BODLAK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ROGER L. GUSTAFSON AND DAVID GUSTAFSON, INDIVIDUALS, AND
R.D.G. ENTERPRISES, INC., A NEBRASKA CORPORATION, APPELLANTS,

V.

PAUL J. BODLAK AND JEAN M. BODLAK, INDIVIDUALS, ET AL., APPELLEES.

Filed December 18, 2018.    No. A-16-1213.

Appeal from the District Court for Thurston County: JOHN E. SAMSON, Judge. Affirmed.

Clarence E. Mock, of Johnson & Mock, P.C., L.L.O., for appellants.

Thomas R. Wilmoth, Ellen C. Kreifels, and Kennon Meyer, of Blankenau, Wilmoth & Jarecke, L.L.P., for appellees Paul J. Bodlak and Jean M. Bodlak.

Charles W. Campbell, of Angle, Murphy & Campbell, P.C., L.L.O., for appellee County of Thurston.

RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Roger L. Gustafson and David Gustafson are the sole shareholders of R.D.G. Enterprises, Inc., a Nebraska corporation (Roger, David, and R.D.G. Enterprises will be collectively referred to as the Gustafsons). The Gustafsons farm properties in Thurston County, Nebraska. They brought an action for damages and injunctive relief against Paul J. Bodlak and Jean M. Bodlak (collectively the Bodlaks) and Thurston County (the County). The Gustafsons claim that separate acts by the Bodlaks and the County impeded the flow of a creek that runs through properties the Gustafsons farm, which caused flooding in the Gustafsons' fields and interfered with their farming activities

- 1 -

and damaged their crop production. After a bench trial, the district court for Thurston County found the Gustafsons had failed to meet their burden of proof as to all of their claims. On appeal, the Gustafsons claim the district court erred by failing to grant their requested injunctive relief against the Bodlaks and the County. We affirm.

## II. BACKGROUND

### 1. LAY OF THE LAND

The Gustafsons farm on multiple properties in Thurston County through which Old Logan Creek (the creek) runs. The relevant sections of land will be referred to as Sections 14, 24, and 25. The creek is a natural watercourse that meanders through Thurston County, and as relevant here, runs southeast from Section 14, through Section 24, and then Section 25. The creek does not drain efficiently because it is relatively flat, and winds back and forth frequently. Logan Creek, known locally as "the dredge," is a separate manmade waterway created to help with drainage in the area. The dredge is west of the creek and runs essentially parallel to the creek until the creek eventually drains into the dredge at a point downstream of all of the properties involved in this action.

The creek flows downstream (northwest to southeast) through the relevant properties and structures in the following order: through the Gustafsons' property in Section 14, under the "E" Avenue bridge in Section 14 ("E" Avenue runs east/west), through property of others in Sections 14 and 24, through another Gustafson property in Section 24, through a 54-inch corrugated metal pipe culvert under 12th Road crossing (12th Road runs north/south, so this culvert allows water to pass from the west to the east under the road), through Gustafson property on the east side of 12th Road in Section 24, then through Gustafson property in Section 25, through Bodlaks' property also in Section 25, through a 48-inch corrugated metal pipe culvert underneath "G" Avenue ("G" Avenue runs east/west along the southern border of Section 25), and then through the property of others before draining into the dredge. The creek absorbs diffuse surface waters from a watershed area above "E" Avenue. Between "E" Avenue and "G" Avenue, it adds additional acres of surface water drainage. "E" Avenue, 12th Road, and "G" Avenue are all public county roads maintained by the County, and the culverts and bridges that allow the creek to pass underneath them are also maintained by the County.

### 2. PROCEDURAL BACKGROUND

On April 17, 2013, the Gustafsons filed a complaint for an injunction and damages against the Bodlaks and the County claiming that actions by each of them caused and will continue to cause flooding of the Gustafsons' properties that are located upstream, resulting in interference with the Gustafsons' farming activities and crop production damage. As to the Bodlaks, the Gustafsons claimed that beginning at least as early as the late 1980's, and continuing up to the date of the lawsuit, the Bodlaks have "filled" the creek channel that passes through the Bodlaks' property. The Gustafsons argued the fill has created a "damming effect" that "blocks, interferes with, and prohibits the free flow of water within the natural drainage channel across the Bodlak property." The Gustafsons claimed this blocks the runoff that naturally flows from the upstream properties they farm, and it has caused and will continue to cause flooding of the Gustafsons' properties located upstream.

As to the County, the Gustafsons claimed the 54-inch culvert at the 12th Road crossing and the 48-inch culvert further downstream at the "G" Avenue crossing caused flooding in their fields because the culverts are "undersized" and inadequate for natural flow purposes. The Gustafsons asserted that the continued use of these culverts will continue to flood their property and result in interference with their farming activities and cause crop damage.

The Gustafsons sought money damages and mandatory injunctions against both the Bodlaks and the County. The money damages were mainly for crop damages and losses allegedly incurred from flooding caused by the Bodlaks and the County in 2010. The Gustafsons asked for an injunction directing the Bodlaks to immediately remove the fill from the portion of the creek channel that runs through the Bodlaks' property. The Gustafsons also asked for an injunction directing the County to "immediately redesign" the drainage structures located at the crossings at both 12th Road and "G" Avenue to increase their size and create a freer natural flow of water at those locations.

The Gustafsons subsequently filed an amended complaint on February 27, 2015, adding as necessary parties the downstream property owners, including the United States (because it held some downstream property in trust for certain Native Americans), and the U.S. Army Corps of Engineers (which had previously exercised jurisdiction over the creek and because it would need to review and approve any modification of structures that affect the flow of the creek). On April 2, the United States and the U.S. Army Corps of Engineers removed the action to the United States District Court for the District of Nebraska, and filed a motion to dismiss the action as to them based on their assertion of sovereign immunity. Their motion was granted on June 11, and the case was remanded back to the district court for Thurston County for further proceedings as to the Gustafsons' claims against the remaining defendants.

### 3. TRIAL AND COURT ORDER

A bench trial took place over 5 days in April 2016, and concluded with a final day of trial on August 2. Only one of the additional property owners named in the Gustafsons' amended complaint filed an answer and participated in the trial in a limited manner; that property owner did not join in this appeal. At trial, the remaining additional property owners were ruled to be in default by the court.

The district court entered a very thorough order on November 30, 2016; we set forth only those portions of the order relevant to the issues on appeal. The district court initially stated that the evidence established that the creek is "a natural watercourse that slopes at the rate of approximately 1.6′ per mile in a meandering fashion through property farmed by the Gustafsons in Sections 14, 24, and 25 . . . [and that the creek] channel on the Gustafson property absorbs diffuse surface waters from a watershed area above "E" Avenue of approximately 6.5 square miles." It noted that between "E" Avenue and "G" Avenue, the creek adds hundreds of additional acres of surface water drainage. Further, the creek "is relatively flat between 'E' Avenue crossing and 12th Road crossing . . . and it meanders in a serpentine manner making it an inefficient drainageway of water from the basin."

The district court indicated that the 54″ corrugated metal culvert at the 12th Road channel crossing was installed by the County "sometime between approximately 1970 and 1980 when the

previous 24′ long bridge was removed," and this culvert "has the maximum capacity to allow approximately 220 [cubic feet per second] of water to flow." The court pointed out that the "12th Road crossing of the [creek] channel had been served by the 54″ wide culvert for more than 30 years prior to the 2010 flood. [The creek] water flow never overtopped 12th Road during that time period, nor subsequent thereto." However, "[o]ver the years, [the] County has experienced an ongoing problem with maintenance of the 12th Road crossing - primarily the west shoulder of the road - due to bank erosion in the location of the culvert."

The district court found that the County repaired the bank and shoulder of 12th Road in the fall of 2009, installing dirt and building up the shoulder to make the road safe for travel. "There was no removal, replacement, or alteration of the culvert at the crossing at 12th Road as part of any road repair project prior to the [June 2010] flood." Two county road workers testified, both of whom the court found were credible witnesses. One said he saw muskrat holes in the bank causing the erosion and the other suggested the erosion was "the result of sloughing off from the road bank." Neither saw any water passing under 12th Road from west to east underneath the road. Therefore, although Roger testified that prior to 2010 he had seen water flowing around the culvert under 12th Road, "[t]here was no credible evidence or any witnesses" to corroborate those observations. The court found that "although water may have been causing the west bank of 12th Road in the area of the 12th Road crossing to erode, the water did not flow, from the west edge of 12th Road to the east edge of 12th Road, around the 54″ culvert under the travelled portion of 12th Road at the [creek] crossing." The court concluded the County's repairs to the west bank of the road between 2000 and 2010, "merely repaired the erosion of the west bank and did not block a flow of water" at that culvert.

The district court also summarized evidence related to the County's study in 2011 of the 12th Road crossing and its erosion problem. It was recommended that the existing 54-inch culvert be replaced with a new 54-inch wide culvert that was 78 feet in length. Alternatively, the existing 54-inch culvert could be replaced with a new 54-inch culvert of the approximate same length as the existing culvert, "but would be anchored with a steel headwall and sheet-pile wings. These structures were to be attached to the new culvert and would be permanently installed to correct the shoulder and bank erosion problems that had previously occurred." The installation of the 78-foot culvert required obtaining an easement from the Gustafsons to accommodate the longer culvert; the Gustafsons refused to grant the easement. Instead, the Gustafsons conditioned any easement on the County installing two 10-foot wide culverts to replace the existing culvert. The district court noted there was no evidence that downstream owners agreed to this request, nor was there any evidence the Gustafsons had obtained approval of their plan by the U.S. Army Corps of Engineers. The engineer advising the County, Brian McDonald, said it would not be appropriate to install the larger culverts "as this would alter the established drainage condition of the [creek] channel under 12th Road as it had existed for many years." McDonald expressed concern the larger structures could increase the flow of the channel and cause potential flooding to downstream landowners; this would alter the established drainage condition such that similar alterations of downstream crossings would be necessary to avoid possible flooding of downstream properties. The district court indicated that it accepted McDonald's testimony "that it is appropriate to consider existing

established conditions in making hydrological recommendations and that this standard is an accepted principle used by hydrology engineers."

In 2011, the County removed the existing 54-inch culvert and replaced it with a new 54-inch culvert, which was anchored with a headwall as recommended by McDonald. It was authorized by the County and approved by the Corps of Engineers. Due to an error in construction, the 54-inch culvert was reinstalled in 2015 to about 1.9 feet lower; this "lower elevation reinstallation was also approved by the Corps of Engineers." The district court found that "[i]t was the County's intent in replacing the damaged 54″ culvert to not alter or affect the established existing drainage of the [creek] channel in any manner as it passed through the properties upstream or downstream from 12th Road."

As for the claim against the Bodlaks, the district court acknowledged that from approximately 1970 through 1985, the Bodlaks removed trees from the creek channel "and began a process of contouring the banks by taking the edges off the banks." No dirt was hauled away from the site, and some of the dirt from the sides of the creek channel went into the creek. The court pointed out the testimony of Paul Bodlak (Paul) that "some of the excess dirt from the sides" went "into the floor of the channel." Paul did this contouring of the creek channel throughout his property in Section 25. Based on aerial photographs of the Bodlaks' property, the court stated, "It is plain to see that beginning in the 1970's, the channel ceased to exist in its natural form. Over the last decade or so, row crops have been planted over some areas of [the creek]." The court then stated:

> The Court finds that [the Gustafsons'] evidence is persuasive that [the] Bodlaks obstructed the flow of water in the [creek] channel on Section 25, to some degree, by raising the elevation of the creek bed. The obstruction has caused a ponding effect, at times, in the [creek] channel between 12th Road crossing and the Bodlaks' northern property line.
>
> The difficulty for the Court is that injunctive relief may only be granted if the obstruction in the natural watercourse constitutes a continuing and permanent *injury* to the landowner. Further, an injunction, in general, is an extraordinary remedy that a court should ordinarily not grant except in a clear case where there is actual and substantial injury.
>
> [The Gustafsons'] expert testified that the ponding of the channel downstream of 12th Road "will inhibit a little bit" the flow of water through the 12th Road crossing from west to east out of the Gustafson field. Whether inhibiting the flow of water "a little bit" rises to the level of a continuing and permanent injury to [the Gustafsons'] real estate is troubling. Although Mr. Bryan's [the Gustafsons' expert] opinion was that the fill placed in the channel on the Bodlaks' property affected the flow of the channel and backs up water onto the [Gustafsons'] property, he acknowledged that: (i) he had not independently verified the rainfall data that was provided to him by [the Gustafsons]; (ii) he did not consider previous rainfall events; and (iii) he did not consider the [Gustafsons'] irrigation practices, the well elevations, or the soil types. Mr. Bryan further acknowledged that it would be reasonable for any engineer to consider all of these factors in determining the cause and effect of flood damage to the [Gustafsons'] property. [The Gustafsons'] expert disclaimed any attempt to evaluate the relative impact of [the] Bodlaks' actions versus [the]

County's action on the flooding in question. Therefore, he could not give an opinion as to the amount of damage, if any, caused by Bodlaks' alterations to [the creek].

(Emphasis in original.) The district court then referred to Neb. Rev. Stat. § 31-225 (Reissue 2016) (dealing with landowner's duty to "dig out" watercourse or drainage course to what it was before it was plowed and seeded to crop, but only if plowing and planting caused overflow or flooding of other land along drainage course). The court went on to conclude:

Therefore, even though the Court finds that [the] Bodlaks have raised the channel bed by some unknown amount which has impeded the flow of water in the [creek] channel, the Court further finds that [the Gustafsons'] expert ascribed a de minimis effect (i.e. the ponding of the channel "will inhibit a little bit" the flow of water). There was no credible evidence that the ponding between 12th Road and [the] Bodlaks' property has ever overflowed the creek bank.

The Court also finds that [the Gustafsons] did not meet their burden of proof to show that the plowing and planting performed by [the] Bodlaks caused an "overflow or flooding of other lands along the course of said drainage ditch, slough, or drainage course."

As discussed above, two other reputable experts in the field of hydrology and hydraulics testified and both disagreed with the underlying flood opinion of [the Gustafsons'] expert. Thomas Riley and Brian McDonald both indicated that there were numerous factors which Mr. Bryan did not consider. Moreover, questions were raised regarding some of the methodology applied by Mr. Bryan. Specifically, the type of hydrologic and hydraulic analysis required to ascertain the impact of each respective Defendant's alleged actions was not performed by [the Gustafsons'] expert. To restore the channel to its natural condition, as requested by [the Gustafsons], there would need to be an additional analysis (e.g. geomorphology analysis, physics of the channel, nature of the watershed, types of vegetation changes, rainfall patterns, etc.) This analysis was not performed. Without proper study, the remediation generally described by [the Gustafsons'] expert could lead to bank destabilization.

. . . .

In this case, the Court finds the [Gustafsons] have not met their burden of proof to show that their right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice because of the continuing nature of the obstruction created by [the] Bodlaks to the natural flow of water in the [creek] channel.

The district court went on to conclude that, for the reasons it had already discussed, the Gustafsons also failed to meet their burden of proof for injunctive relief against the County by failing to show that the installation and maintenance of the 54-inch culvert at 12th Road crossing and the 48-inch culvert at "G" Avenue created an obstruction in the creek drainageway due to the culverts being undersized.

The district court's opinion also noted that the Gustafsons' "real estate is, in large part, located in a flood plain. Water standing and slowly draining from a flood plain is expected to occur on occasion." The court pointed out that the experts testifying on behalf of the Bodlaks and the

County disagreed with many of the opinions expressed by the Gustafsons' expert, and found "the hydrologic/hydraulic expert testimony" given by the defendants' experts to "be more credible" than the opinions of the Gustafsons' expert.

In conclusion, the district court found that the Gustafsons had failed to meet their burden of proof as to all claims, and dismissed their amended complaint as to all defendants with prejudice. The Gustafsons appeal.

### III. ASSIGNMENT OF ERROR

The Gustafsons assign, consolidated and restated, that the district court erred by failing to grant mandatory injunctive relief against the Bodlaks and the County.

### IV. STANDARD OF REVIEW

An action for injunction sounds in equity. *Hauxwell v. Henning*, 291 Neb. 1, 863 N.W.2d 798 (2015). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. *Id.*

### V. ANALYSIS

The Gustafsons assert that the actions by the Bodlaks and the County impeded the flow of the creek, which will lead to continued flooding, violating the Gustafsons' rights under the common law and Neb. Rev. Stat. § 31-224 (Reissue 2016). Accordingly, they argue that the district court should have granted their requested mandatory injunctive relief against both the Bodlaks and the County. As noted in our summary of the district court's order, the district court based part of its analysis on § 31-225 rather than § 31-224. Therefore, the Bodlaks contend that § 31-224 is not applicable on appeal because it was not presented to or passed upon by the trial court. However, as the Gustafsons correctly note in their reply brief, at the outset of trial the district court reviewed the elements of the common law and § 31-224, and the Gustafsons' counsel agreed that was what was being argued. Because the Gustafsons only argue on appeal that they are entitled to an injunction under the common law and § 31-224, we need not address § 31-225 any further.

Additionally, the Gustafsons are not challenging the district court's denial of their request for damages against either the Bodlaks or the County; thus, the evidence pertinent to allegations of inverse condemnation and other damages will not be discussed. Further, the Gustafsons' claim against the County focuses on evidence relevant to the 54-inch culvert at 12th Road crossing. Although they generally assert that the County's decision to install a new 54-inch culvert at 12th Road crossing without changing the "48-inch pipe at G Avenue crossing" led to their property being "sacrificed for a water storage" area, brief for appellants at 34, they make no argument nor direct us to evidence in the record specific to the 48-inch culvert at the "G" Avenue crossing. Our analysis will be limited accordingly.

#### 1. RELEVANT STATUTORY AND COMMON LAW

The Gustafsons argue that the Bodlaks and the County obstructed water flow within the channel in violation of § 31-224 and the common law. Section 31-224 states:

It shall be the duty of landowners in this state, or tenants of such landowners when in possession, owning or occupying lands through which a watercourse, slough, drainage ditch or drainage course lies, runs or has its course, to clean such watercourse, slough, drainage ditch or drainage course at least once a year, between March 1 and April 15, of all rubbish, weeds or other substance blocking or otherwise obstructing the flow of the water in such watercourse, slough, drainage ditch or drainage course, whenever such obstruction is caused by any of the acts of said owner or tenant, or with his knowledge or consent[.]

A watercourse is defined as "[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook." Neb. Rev. Stat. § 31-202 (Reissue 2016). Also, any person violating § 31-224 (or § 31-225) and who has been notified by an owner or tenant having the same watercourse running through the land owned or occupied by such person, "at least ten days before filing of a complaint, to remove an obstruction in such watercourse," and "who shall fail to comply with such notice, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not more than ten dollars and be liable for all damages caused by reason of such obstruction." Neb. Rev. Stat. § 31-226 (Reissue 2016). No details are provided in the statute, other than the 10-day notice provision, for the procedure leading to a possible misdemeanor conviction.

Under the common law in Nebraska,

"[d]iffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. But when diffused surface waters are concentrated into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply. . . . '[A] natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage channel or depression. Thus, it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all the waters which may be reasonably anticipated to drain therein, and that this is a continuing duty.'"

*Romshek v. Osantowski*, 237 Neb. 426, 466 N.W.2d 482 (1991) (citation omitted). The duty to refrain from structural obstruction of a natural drainageway is imposed on private proprietors and public officials as well. *Gruber v. County of Dawson*, 232 Neb. 1, 439 N.W.2d 446 (1989).

### 2. INJUNCTIONS

Injunctive relief may be granted to an adjoining landowner upon a proper showing that an obstruction in a drainageway or natural watercourse constitutes a continuing and permanent injury to that landowner. *Riha v. FirsTier Bank*, 248 Neb. 785, 539 N.W.2d 632 (1995). A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury. *Bock v. Dalbey*, 283 Neb. 994, 815 N.W.2d 530 (2012). It is considered an extreme or harsh remedy that should be exercised sparingly and cautiously. *Id.*

Further, an injunction, in general, is an extraordinary remedy that a court should ordinarily not grant except in a clear case where there is actual and substantial injury. *Id.* And a court should not grant an injunction unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Id.*

An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity. *Obermiller v. Baasch*, 284 Neb. 542, 823 N.W.2d 162 (2012). A remedy at law is not adequate if the situation requires and the law permits preventative relief as preventing the repetition and continuance of wrongful acts. *Hogelin v. City of Columbus*, 274 Neb. 453, 741 N.W.2d 617 (2007). Where an injury committed by one against another is continuous or is being constantly repeated, so that complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction. *Obermiller, supra.* In such cases, equity looks to the nature of the injury inflicted, together with the fact of its constant repetition, or continuation, rather than to the magnitude of the damage inflicted, as the ground of affording relief. *Id.*

The party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle him or her to relief. *ConAgra Foods v. Zimmerman*, 288 Neb. 81, 846 N.W.2d 223 (2014).

Therefore, in order to warrant their requested injunctive relief under the common law or § 31-224, the Gustafsons had to show that the water that "flows" or "drains" through the creek was obstructed by the actions of the Bodlaks and/or the County, causing injury to the Gustafsons continuously or repeatedly. See *Obermiller, supra.* It was the Gustafsons' burden to establish by a preponderance of the evidence every controverted fact necessary to show they were entitled to relief. See *ConAgra Foods, supra*.

The Bodlaks and the County both argue on appeal that the Gustafsons were required to prove liability separately against each of them--i.e., that each of them separately, rather than jointly or collectively, caused the flooding by their actions--and failed to do so. However, we need not address those arguments because after our review of the evidence, we agree with the district court that the Gustafsons failed to prove the alleged obstructions to the creek would continuously or repeatedly cause them injury, as discussed further below. We supplement, or as needed, reiterate, the evidence already set forth in our summary of the district court's order.

### 3. TRIAL EVIDENCE

#### (a) Actions by the Bodlaks

Paul Bodlak testified that when he bought the property, the banks of the creek were approximately 10 feet high. Starting in the early 1970's until about 1985, he made improvements to the property to facilitate farming. He first removed the trees, then he contoured the banks using a "dozer" to take the edges off, which widened and lowered the banks. He did not haul any dirt away from his property in the process. Paul utilized the same method to change the contours of the creek channel across all of his property, and dirt from the sides of the channel that he contoured went into the creek. Paul also brought in crushed rock and concrete to make a driveway through

the creek so he could pass to the other side because he farms on both sides of the creek; he testified the rock and concrete were compacted down into the ground below the creek bed.

### (b) Actions by the County

The County used a 54-inch corrugated metal pipe for the channel crossing at 12th Road. As noted previously, the culvert was installed sometime between approximately 1970 and 1980 when a bridge was removed. In 2011, the County installed a new 54-inch culvert, which had to be repositioned to the correct height in 2015.

### (c) Gustafsons' Properties Flood in 2010 and 2014

Roger testified he had observed the creek thousands of times from 1986 to 2010. During that time period, the creek channel overflowed its banks 12 to 15 times, flowing into the low areas or depressions along the banks and making its way "into one or two places that were on [his] farm that were further back in the field." However, the overflow usually receded back into the channel within 24 hours, with the exception of a few small areas. None of those overflow events resulted in claims on the Gustafsons' crop insurance between 1988 and 2010 (there is no indication in our record as to whether any claims were filed between 1986 and 1988, or even if the Gustafsons had crop insurance during that time). Roger could not recall damaging flooding prior to 2010 on the properties the Gustafsons farmed.

Roger testified the Gustafsons' properties along the creek upstream of the Bodlaks' property were flooded after a rainfall in June 2010, which began on the night of June 10. He stated there were no significant "rain events" that year prior to June 10, and he did not believe the ground was "particularly wet" prior to the rain on June 10. The Gustafsons have three different rain gauges located near different properties they farm within the drainage basin of the creek, and the rain gauges showed there were 1.8 to 2.1 inches of rainfall after it rained on the night of June 10, and into the morning of June 11. He stated that after the rain, the water in the channel backed up all of the way through the properties that the Gustafsons farm, preventing their fields from draining fast enough and causing crop losses.

Roger testified that the summer of 2014 was the only "flood event" he could recall that occurred between 2011 and 2015. He defined a flood event as when water leaves the banks of the creek. He estimated there were 2.6 inches of rain on the evening of June 14, 2014, until the morning of June 15, based on his own measurement. As a result of the rain, the creek filled up and the Gustafsons' fields could not drain once again. The Gustafsons' amended complaint did not claim damages as a result of any flooding in 2014.

### (d) Expert Testimony Regarding the Bodlaks' Actions

George Bryan, a civil engineer with experience in "hydrology and drainage issues," testified as an expert for the Gustafsons. Bryan testified that the condition of the creek channel on the Bodlaks' property obstructed the water flow in the channel and caused flooding to the Gustafsons' property in 2010. He stated there was a high point in the creek channel on the Bodlaks' property, and that high point would cause ponding upstream because it requires the water to get up to a certain elevation before it can run over that high point and downstream through the

Bodlaks' property. Bryan was asked if this ponding could "inhibit the flow of water through the 12th Road crossing . . . out of the Gustafson field," and he responded, "[a] little bit."

Bryan recommended requiring the Bodlaks to remove the fill caused by their farming activities, and return the channel floor to a uniform slope equal to the channel's original flow line across their property. His recommendation was based on his own calculations and a diagram (exhibit 395) created by the Bodlaks' expert, Thomas Riley. On cross-examination, Bryan admitted he did not know what the natural channel elevation was; though he stated it could be calculated based on the natural channel that exists "above" the "E" Avenue creek crossing and "below" the "G" avenue creek crossing. (It appears from the record that "original flow line" was used interchangeably with "natural channel elevation" by the attorneys at trial.)

During cross-examination, Bryan testified that in formulating his opinion and recommendations as to the Bodlaks' property, he relied on rainfall data from Roger, rather than relying on independent rainfall data. Bryan did not survey the depth of the Gustafsons' creek channel, and he calculated the slope of the creek bed by using the elevations given on a "U.S. Geological Survey" (USGS) map, but did not know what the error rate was for the elevations he used from that source. And Bryan did not consider prior rainfall amounts, groundwater elevations in the area, or the impact of the Gustafsons' irrigation practices on the soil moisture profile, in his opinion that the Bodlaks' actions had caused flooding on the properties farmed by the Gustafsons in 2010. When asked if, in order to answer what the "cause and effect" of that flooding was, it would be appropriate and reasonable for an engineer to "evaluate all of these factors," Bryan agreed it would be appropriate and reasonable.

Thomas Riley, a civil engineer, testified as an expert for the Bodlaks. His resume states he has professional experience in hydrology and hydraulics, and hydrologic and hydraulic modeling. The record reflects that hydrology is the "study of streamflow" whereas hydraulics "would be looking at the effect of precipitation and how that might affect streamflow for different conditions."

Riley testified that he created a hydraulic model to investigate whether the actions by the Bodlaks on their property had modified the ability of the creek "to run water through." The model evaluated three different levels of water flow from the property farmed by the Gustafsons, through the 12th Road crossing, and into the Bodlaks' property based on the shape of the creek on the Bodlaks' property. Riley created a report and diagram (exhibit 395), showing the results of his hydraulic modeling. Riley opined, based on his simulations of water flow, that nothing on the Bodlaks' property was causing water to leave the channel anywhere upstream of the Bodlaks' property line. He also opined that the creek channel widens and becomes shallower as it progresses downstream on the Bodlaks' property, which would only serve to increase the capacity of the creek on the Bodlaks' property during "high flow events," and accordingly "[he] would expect flooding to occur throughout the Bodlaks' [p]roperty before any flooding could occur in the upstream segments, which are narrower and deeper." Riley admitted on cross-examination however, that his model was not designed to calculate the amount of water pooling on the properties in question. Riley also acknowledged on questioning from the court that the 6-inch rise in the elevation of the creek channel on the Bodlaks' property would be an impediment to the flow of water.

Riley's analysis included an evaluation of the soil types involved, the impact of the slopes of the land, as well as weather and climatological conditions in 2010, and their impact on a hydraulic calculation. Riley looked at historical rainfall data, and concluded 2010 was "quite a bit higher than the average at that time" and was preceded by other years of high precipitation relative to the average taken from 1948 to 2013. He stated he would expect more runoff potential as a result. His rain data originated from the "Wakefield station," 7 to 10 miles to the north and west of the properties in question. Riley testified the data was "within 10 percent or so" of the data that Paul Bodlak had for June 2010, and he did not question its reliability. (Paul testified he recorded the temperature and rainfall each day for 40 years on a calendar as part of his regular farming practice. He used his own "government approved" rain gauge and a "recording" thermometer to take the measurements he recorded. His records contain total rainfall amounts for each month, and those records show there were 8.25 inches in June 2010.)

Riley agreed during cross-examination that generally hydrologists take into account the existing "established conditions" when assessing the repair or replacement of an existing drainage structure. He did not agree with Bryan's suggestion to return the creek to its natural state. Riley noted that Bryan used an outdated, and thus unreliable, topographic map in his analysis. The map was from 1966, and had vertical references for elevation from 1929. Riley stated that he and McDonald used an updated topographic map from 2014, with 1988 data. Riley believed that restoring the creek to its natural state would require analysis of the effect of road grades, culverts, changes to the channel itself as a result of farming over the years, the existence of the dredge, and the use of center pivots. He stated one would need to look at and evaluate what the hydrologic and hydraulic impact of the recommendations made by Bryan would be downstream because the changes would affect multiple landowners, communities, and the County; and that there could be higher volumes of water at a higher frequency, which has the potential to affect the creek's stability.

However, contrary to Riley's opinion, Bryan did not believe there would be additional risk to the downstream landowners if his recommendations were implemented because the changes he recommended "would return the flow to a preconstruction state, meaning preconstruction of what was taking place on the Bodlaks' property and the county crossings." He testified the creek flow would return to what it was before the changes were made by the Bodlaks and the County, and the creek would be able to handle the flow without any additional risk to the downstream landowners. However, on cross-examination, he admitted that the extra water flowing through the crossings if his recommendations were implemented would potentially flood those downstream landowners, but he claimed this would not result in more flooding than would have occurred prior to the changes to the channel.

(e) Expert Testimony Regarding the County's Actions

Bryan opined that the 54-inch pipe at the 12th Road crossing is too small, and caused flooding on the properties farmed by the Gustafsons along the creek in June 2010. Bryan recommended that the County replace the drainage structures at the 12th Road and "G" Avenue crossings with four 6-foot culverts or an equivalent box culvert. He stated his recommendations for the culvert sizes were based on "calculations to determine what the flow would be for a 25-year

storm" pursuant to the procedure in the Nebraska Department of Roads Drainage Design and Erosion Control Manual (NDRM). He defined a 25-year storm as "five inches in a 24-hour period." He stated that his recommended structures would "be able to handle an instantaneous peak flow from a 25-year storm and the backwater buildup."

Brian McDonald, the County's expert witness, is a civil engineer who also serves as the Thurston County engineer. He has "Qualifications" in "Bridge and Culvert Hydrology and Hydraulics." McDonald testified that he conducted a drainage study of the creek channel between the "E" avenue crossing and the 12th Road crossing in 2011 because of repeated erosion on the shoulder of the road on the west side of the 12th Road crossing. McDonald testified he was told the 54-inch culvert at the 12th Road crossing had been in place for approximately 30 years, which he stated "established an existing condition." He stated the consideration of the established drainage condition is a principle that is accepted by hydrologic engineers who design drainage structures, and it was appropriate to consider them in making hydrology recommendations.

McDonald recalled that the Gustafsons had requested a larger pipe at the time of his study, but he did not believe a larger pipe was appropriate because it would lead to flooding downstream that had not previously occurred while the existing culvert had been in place. Instead, he recommended either a longer pipe or a pipe with headwalls to prevent the erosion of the shoulder. The Gustafsons would not grant the County an easement for a longer pipe, so the county installed the pipe with headwalls in 2011. After the Gustafsons complained about the height of the new pipe, McDonald surveyed it and determined it was 1.9 feet too high; the pipe was lowered in 2015 and a subsequent survey confirmed it had been repositioned to the correct height.

McDonald was asked on direct examination how he would explain the flooding that occurred in June 2010 in the Gustafsons' fields. He testified that a number of things contributed to the flooding. First, the fields are part of a "FEMA" floodplain. Additionally, both the flat and the meandering path of the channel inhibit the channel's ability to carry water away from the area. The property in question is extremely flat and the pockets that do not have natural drainage will fill with water and hold it. The soils were also saturated, and the more the soils are saturated, the more a rain event is going to cause water runoff.

McDonald acknowledged that in his deposition he had stated the culvert at the 12th Road crossing has "been acting like a dam for the water that comes within the channel" because "the size of the 54-inch tube isn't great enough to allow [the water] to pass." He agreed that the design and maintenance of a structure that crosses a waterflow needs to take into account the structure's effect on the surrounding area, and it would never be acceptable to ignore that standard, but stated that he did assess the "effective surrounding area." He stated that if he wanted a structure that would pass all of the water that could pass through the "E" Avenue crossing, it would be roughly 10 feet in diameter, but putting in such a structure would be "leaving out" the existing condition of the size of the culvert at the 12th Road crossing in the past. He testified that if the structure were enlarged at the 12th Road crossing, there would be flooding to downstream property owners unless similar crossing enlargements were made downstream, though he had not done the calculations as to what the effect on those downstream owners would be.

McDonald said he reviewed Bryan's analysis and recommendations. He stated that the method Bryan used, a ratio analysis which "divide[s] the area of the crossing by the drainage area

- 13 -

above that point . . . and . . . relate[s] it to the size of the structures in the drainage basin," is not a method to use to size drainage structures because "there's a number of things that can affect the size of the crossing at a particular location." McDonald stated it was not appropriate for Bryan to disregard the established condition. According to McDonald, Bryan's analysis and calculations failed to account for the energy loss through the culvert and through the "reach length of the channel," which means Bryan could not "calculate the amount of backwater that's going to take place with the culvert." McDonald further stated that the NDRM used by Bryan is a guideline, and not everything would be applicable to county roads, nor would it impose a duty on the County to install a larger culvert at the 12th Road crossing. McDonald testified the FEMA guidelines for road crossings are also applicable to the 12th Road crossing, and that the culvert at 12th Road crossing meets those guidelines. Finally, McDonald agreed that downstream landowners would have adopted farming practices based on the established condition of the size of the culvert for 30 years, and that the implementation of Bryan's recommended drainage structures would increase flooding downstream.

### 4. DISTRICT COURT'S FINDINGS

We previously set forth key portions of the district court's November 30, 2016, order. As evident from our review of the record, determining the cause of the June 2010 flooding on the Gustafsons' property required explanations and opinions from experts educated and trained to understand such issues. The Gustafsons, the Bodlaks, and the County each supplied an expert, and each provided helpful information for the district court's determination of the factual issues. Significantly, however, the district court found the expert testimony of McDonald and Riley to be more credible than the expert testimony of Bryan, and therefore gave the testimony of McDonald and Riley more weight. This was certainly within the district court's province as the fact finder. Triers of fact are not required to take opinions of experts as binding upon them, and determining the weight to be given expert testimony is uniquely the province of the fact finder. *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018).

However, we must nevertheless review the factual questions de novo on the record, and we are obligated to reach conclusions of fact independent of the conclusions reached by the trial court. See *Hauxwell v. Henning*, 291 Neb. 1, 863 N.W.2d 798 (2015) (injunction sounds in equity, and on appeal from equity action, appellate court tries factual questions de novo on record and, as to questions of both fact and law, is obligated to reach conclusion independent of conclusion reached by trial court). Therefore, with these legal principles in mind, we next discuss this court's independent consideration of the applicable law and the evidence presented.

### 5. LAW AND EVIDENCE

#### (a) Claim Against the Bodlaks

The Gustafsons argue to this court that "[t]he question is not whether the obstruction created by the Bodlaks has created a 'de minimis' injury to the Gustafsons' right to have water flow freely through their property but whether Gustafsons' common law and statutory rights related to water flow in the [creek] were infringed." Brief for appellant at 37. They assert that "[o]nce a violation of a duty and injury flowing from that violation has been established," we must

look to see if an adequate remedy at law exists before injunctive relief can be imposed, and such inquiry requires an assessment of whether "'a particular situation requires and the law permits preventative relief to avoid repetition and continuation of wrongful acts.'" *Id*. The Gustafsons claim that "[t]he evidence unquestionably showed the obstruction created by [the] Bodlaks will continue and the effects of the obstruction will be repeated unless the obstruction is removed." *Id*.

Like the district court, we conclude the Bodlaks' adding fill to the creek bed may have caused some impediment to the flow of water between the 12th Road crossing and the higher elevation on the Bodlaks' property, but that an extraordinary remedy such as an injunction was not warranted in this instance based on the evidence adduced at trial. The Gustafsons' expert, Bryan, stated that his analysis and conclusion (that the fill in the creek on the Bodlaks' property was causing an obstruction) was based on a high point in the creek caused by fill that begins on the Bodlaks' property, and that ponding would occur upstream of the high point because it requires the water to get up to a certain elevation before it can run over the high point and down through the Bodlaks' property. However, as the district court noted in its order, Bryan was asked if this ponding could "inhibit the flow of water through the 12th Road crossing from the west to the east out of the Gustafson field" and he responded, "[a] little bit." Bryan offered no testimony as to what amount or frequency of flooding or failure to drain, if any, would be caused by the flow of water in the creek being inhibited "a little bit" by the fill in the creek bed of the Bodlaks' property. There is nothing in the record indicating how much rainfall in any combination of the areas upstream could be expected to cause flooding or drainage issues on the Gustafsons' properties because of the inhibited creek flow, nor what impact the soil saturation and agricultural practices of the property owners along the creek may have had. Additionally, Riley opined that the creek channel widens and becomes shallower as it progresses downstream on the Bodlaks' property, which would only serve to increase the capacity of the creek on the Bodlaks' property during "high flow events," and accordingly "[he] would expect flooding to occur throughout the Bodlaks' [p]roperty before any flooding could occur in the upstream segments, which are narrower and deeper."

Moreover, Riley disagreed with Bryan's opinion and testified that based on his (Riley's) analysis, nothing on the Bodlaks' property caused water to leave the channel anywhere upstream of the Bodlaks' property line. We agree with the district court that the Gustafsons failed to meet their burden of proof that the alleged obstruction in the channel in the Bodlaks' property will continuously or repeatedly prevent the Gustafsons' fields from draining properly. Therefore, a mandatory injunction is not the appropriate remedy.

(b) Claim Against the County

In considering the claim against the County, the district court stated it was applying the same reasoning from its analysis regarding the competing expert testimony and the request for injunctive relief as it had in the claim against the Bodlaks. The court found that the Gustafsons had not sustained their burden of proof that the culverts at either the 12th Road or the "G" Avenue crossings had created an obstruction in the creek due to being undersized. We agree.

Bryan opined that the 54-inch pipe at the 12th Road crossing is too small, and caused flooding on the properties farmed by the Gustafsons along the creek in June 2010. Based on his calculations for the instantaneous peak flow of drainage from a "25-year storm" using procedures

in the NDRM, Bryan recommended that the County replace the drainage structures at the 12th Road and "G" Avenue crossings with four 6-foot culverts or an equivalent box culvert. Although the Gustafsons' contend that the NDRM should have been considered, the NDRM does not appear in our record, and there is conflicting testimony as to whether the NDRM applies to the facts of this case. While Bryan testified the NDRM does apply, McDonald disputed whether or how those standards should have been applied. McDonald suggested the FEMA guidelines should have also been used, although those guidelines are also absent from our record. Furthermore, there is nothing in the record indicating whether the NDRM procedures are affected by soil types, or the location of the structure in a floodplain or near irrigated agricultural land; these are factors that McDonald and Riley testified were relevant to the analysis.

Even if the applicability of the NDRM in general was not contested, McDonald criticized Bryan's use of a "ratio analysis" and said it was not an appropriate method to use to size drainage structures because "there's a number of things that can affect the size of the crossing at a particular location." According to McDonald, Bryan's analysis failed to account for several factors including the established condition and energy loss through the culvert and through the length of the channel; Riley also agreed that the existing condition should be considered.

The Gustafsons also point to McDonald's concession that he had previously stated in his deposition testimony that the culvert at the 12th Road crossing has "been acting like a dam for the water that comes within the channel" because "the size of the 54-inch tube isn't great enough to allow [the water] to pass." Further, McDonald also admitted that if he wanted a structure that would pass all of the water that could pass through the "E" Avenue crossing it would be roughly 10 feet in diameter. However, McDonald also testified he did not believe that the flooding was caused by the pipe size. He stated that putting in a larger structure would be "leaving out" consideration of the existing condition at the 12th Road crossing in the past, and that if the structure were enlarged at the 12th Road crossing, there would be flooding to downstream property owners unless similar crossing enlargements were made downstream.

Beyond the NDRM and methodology problems discussed above, Bryan's testimony itself suffered from additional deficiencies. Bryan testified extensively that the flooding in the Gustafsons' fields in June 2010 was caused by the size of the 54-inch culvert at the 12th Road crossing, but he failed to testify whether or why flooding or improper drainage will occur continuously and repeatedly in the future as a result of the size of that culvert. He provided no explanation for why the use of a culvert capable of handling the instantaneous peak flow of drainage from a "25-year storm" would be the necessary or correct measure to prevent such continuous or repeated drainage issues in the Gustafson's fields, despite using it as the basis for his recommendation. Moreover, he also testified:

> The flow that goes through the 12th Road crossing is going to depend on how quickly it's approaching from upstream and how deep the water is on this side, and that will vary with the rate at which it falls and how long it's going to take to get down to the crossing.

However, Bryan provided no testimony as to how those factors would relate to a "25-year storm," and its effect on the Gustafsons' property and the drainage basin that surrounds it. Ultimately we are left with his conclusion that the size of the culvert caused the June 2010 flooding to some

unspecified extent, but no testimony regarding whether or how future drainage issues will occur continuously and repeatedly due to the culvert's size. We are also left without testimony from Bryan regarding what effect the other relevant factors, as discussed by McDonald and Riley, could have had on the June 2010 flooding. Accordingly, we find Bryan's testimony failed to meet the Gustafsons' burden of proof required to obtain injunctive relief against the County.

### (c) Summary

In sum, the Gustafsons failed to show by a preponderance of the evidence that the actions of the Bodlaks or the County will impede the flow of the creek in a way that causes improper drainage from the Gustafsons' fields continuously or repeatedly, which would make the remedy at law inadequate and warrant an injunction. See *Obermiller v. Baasch*, 284 Neb. 542, 823 N.W.2d 162 (2012). As we noted above, an injunction, in general, is an extraordinary remedy that a court should ordinarily not grant except in a clear case where there is actual and substantial injury. *Bock v. Dalbey*, 283 Neb. 994, 815 N.W.2d 530 (2012). Given the caution Nebraska courts are to use in granting injunctive relief, and the inconclusive record before us, we conclude the district court correctly denied the Gustafsons' requests for injunctive relief against either the Bodlaks or the County.

### VI. CONCLUSION

For the reasons set forth above, we affirm the district court's order denying the Gustafsons' requests for injunctive relief against the Bodlaks and the County.

AFFIRMED.

WELCH, Judge, participating on briefs.